**KOLLER LAW LLC**
David M. Koller, Esq. (Pa 90119)
Jordan D. Santo, Esq. (Pa 320573)
2043 Locust Street, Suite 1B
Philadelphia, PA 19103
T: (215) 545-8917
F: (215) 575-0826
davidk@kollerlawfirm.com
jordans@kollerlawfirm.com

*Counsel for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JACQUELINE NUBER,**<br>**Plaintiff,** | : | **Civil Action No. 26-7437** |
| | : | |
| **v.** | : | **Complaint and Jury Demand** |
| | : | |
| **COLLIERS ENGINEERING & DESIGN, INC.,**<br>**Defendant.** | : | |

**CIVIL ACTION**

Plaintiff, Jacqueline Nuber (hereinafter "Plaintiff"), by and through her attorney, Koller Law, LLC, brings this civil matter against Colliers Engineering & Design, Inc. (hereinafter "Defendant"), for violations of the Age Discrimination in Employment Act ("ADEA") the Americans with Disabilities Act of 1990, as amended ("ADA"), the Philadelphia Fair Practices Ordinance ("PFPO") and the Family and Medical Leave Act of 1993, as amended ("FMLA"). In support thereof, Plaintiff avers as follows:

**THE PARTIES**

1. Plaintiff incorporates the preceding paragraphs as if set forth more fully at length herein.
2. Plaintiff is an adult individual residing in Bethlehem, PA.
3. Upon information and belief, Defendant Colliers Engineering & Design, Inc. is a provider of engineering and architecture, design and consulting services with a location at 2 Penn

Center, 1500 JFK Boulevard, Suite 700, Philadelphia, PA 19102 and corporate headquarters located at 101 Crawfords Corner Road, Suite 3400, Holmdel, NJ 07733.

4. Defendant is an entity engaged in an industry or activity affecting commerce which employs 50 or more employees in all of its offices for each working day during each of 20 or more calendar workweeks in the current or preceding year.

5. At all times material hereto, Plaintiff was employed by Defendant for at least twelve hundred and fifty (1,250) hours of service during the twelve-month period prior to requiring leave.

6. At all times relevant hereto, Defendant employed managers, supervisors, agents, and employees who Plaintiff alleges had the authority to make decisions concerning Plaintiff's employment. In making said decisions, these individuals engaged in the pattern and practice of discriminatory treatment, which forms the basis of Plaintiff's allegations in the instant Complaint.

7. At all times relevant hereto, Defendant employed managers, supervisors, agents, and employees who acted directly or indirectly in the interest of the employer. In so acting, these individuals engaged in the pattern and practice of discriminatory treatment, which forms the basis of Plaintiff's allegations in the instant Complaint.

**<u>JURISDICTION AND VENUE</u>**

8. Plaintiff incorporates the preceding paragraphs as if set forth more fully at length herein.

9. The Court may properly maintain personal jurisdiction over Defendant because the Defendant's contacts with this state and this judicial district are sufficient for the exercise of jurisdiction and comply with traditional notions of fair play and substantial justice, thus satisfying the standard set forth by the United States Supreme Court in *International Shoe*

*Co. v. Washington*, 326 U.S. 310 (1945) and its progeny.

10. The Court may exercise original subject-matter jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) because it arises under the laws of the United States and seeks redress for violations of federal law.

11. The Court may also maintain supplemental jurisdiction over state law/local ordinance claims set forth herein pursuant to 28 U.S.C. § 1367(a) and Rule 18(a) of the Federal Rules of Civil Procedure because they are sufficiently related to one or more claims within the Court's original jurisdiction that they form part of the same case or controversy.

12. Venue is properly laid in the Eastern District of Pennsylvania pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2) because Plaintiff is domiciled in this judicial district, the Defendant is located in this judicial district and because all of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

13. Plaintiff incorporates the preceding paragraphs as if set forth more fully at length herein.

14. Plaintiff exhausted her administrative remedies under the ADA, the ADEA and the PFPO.

15. On April 2, 2024, Plaintiff, while still employed, filed an Inquiry with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging age and disability discrimination as well as retaliation.

16. The EEOC assigned the Inquiry No. 530-2024-04748.

17. Plaintiff spoke with EEOC Investigator Tarik Linthicum on August 12, 2024; at the time Plaintiff remained employed with Defendant.

18. The first Inquiry was administratively closed before a Charge was filed.

19. The August 12, 2024, correspondence provided filing information but did not state that the Inquiry had been administratively closed.

20. Following Plaintiff's termination on September 26, 2024, Plaintiff contacted Investigator Linthicum on December 19, 2024, while the PHRA filing period remained open.

21. Plaintiff reported that she had been terminated, stated that she strongly believed the termination was discriminatory and retaliatory, and asked how to obtain another appointment because her employment status had changed.

22. When she received no response, Plaintiff followed up on December 23, 2024 and expressly asked whom she needed to speak with to "open my case again."

23. On April 5, 2025, Plaintiff submitted a second EEOC online inquiry concerning her termination and related discrimination and retaliation.

24. That second inquiry became Inquiry No. 530-2025-05032.

25. On April 9, 2025, Linthicum informed Plaintiff that her earlier April 2, 2024 Inquiry No. 530-2024-04748 had been administratively closed on August 12, 2024.

26. Plaintiff then proceeded with the second matter and executed the verified Form 5 Charge of Discrimination in No. 530-2025-05032 on May 30, 2025.

27. On May 30, 2025, Plaintiff timely filed a Charge of Discrimination ("Charge") with the EEOC alleging disability and age discrimination as well as retaliation against Defendant.

28. The Charge was assigned a Charge Number 530-2025-05032 and was dual filed with the Philadelphia Commission on Human Relations ("PCHR").

29. The EEOC issued Plaintiff a Dismissal and Notice of Rights ("Right to Sue") via request relative to the Charge and that Notice is dated August 6, 2026.

30. Prior to the filing of this action, Plaintiff notified the EEOC of her intent to proceed with a lawsuit in federal court.

31. Plaintiff files the instant Complaint within ninety (90) days of her receipt of her Right to Sue in this matter, as it relates to her federal law claims, and more than one (1) year after filing but within two (2) years of the issuance of the Right to Sue in this matter as it relates to her PFPO claims.

32. Plaintiff has exhausted her administrative remedies as to the allegations of this Complaint.

**MATERIAL FACTS**

**PLAINTIFF'S EMPLOYMENT HISTORY**

33. Plaintiff incorporates the preceding paragraphs as if set forth more fully at length herein.

34. Plaintiff was born in 1965.

35. On or about February 6, 2023, Defendant hired Plaintiff in the position of Project Manager overseeing architectural projects in the Science, Technology & Industry ("STI") Division.

36. Plaintiff was well qualified for her position and performed well.

37. Plaintiff's 2023 performance-review materials reflected successful management of multiple projects and favorable performance in multiple project-management categories.

38. On January 22, 2024, Defendant awarded Plaintiff a four-percent merit increase. CED's written pay-adjustment memorandum thanked Plaintiff for her dedication to her work, team, and the firm.

39. Plaintiff was selected for and participated in Defendant's Seller-Doer development efforts. Project-management tools and workflows developed by Plaintiff were used within Defendant's Project Manager group and Federal Group, and Plaintiff's work was featured in recorded CED training videos made publicly available.

**PLAINTIFF IS DISABLED AND NOTIFIED DEFENDANT OF HER DISABILITIES**

40. Plaintiff has the serious medical condition of attention deficit/hyperactivity disorder ("ADHD"), adjustment disorder with mixed anxiety and depressed mood ("anxiety and depression") which are considered to be disabilities under the Americans with Disabilities Act of 1990, as amended ("ADA"), the Pennsylvania Human Relations Act ("PHRA") and the Philadelphia Fair Practices Ordinance ("PFPO").
41. Plaintiff's ADHD and related conditions substantially limit, particularly during periods of exacerbation, major life activities including concentrating and thinking and executive-function tasks such as organization, prioritization, and sustained attention.
42. Throughout 2023, Plaintiff notified Laura Urwin, Senior Design Manager and Plaintiff's direct supervisor, and Ryan Andrulewich (late 30's), Geographic Discipline Leader, Architecture, of her ADHD diagnosis on multiple occasions.
43. On November 14, 2023, Plaintiff expressly disclosed her ADHD in writing in connection with her nomination of Andrulewich for Manager of the Year.
44. Plaintiff described ways ADHD affected her communication and work style and stated that Andrulewich was aware of and had worked with her ADHD-related characteristics.
45. The nomination described mentoring and support Andrulewich had provided earlier in Plaintiff's employment; Plaintiff alleges that this support materially diminished after her June 2023 Human Resources complaint regarding Julianne Cagney (early 30's), Senior Interior Designer.
46. Plaintiff entered the relevant year-end self-review comments in October 2023.
47. On February 18, 2024, she accessed and printed the review from Defendant's HR/performance portal.

48. The review documented her ADHD, her concerns regarding Cagney's conduct, and her reporting to Human Resources.

49. The following day, February 19, 2024, Andrulewich summoned Plaintiff to the "PM Skills" meeting described below.

50. These written disclosures, together with Plaintiff's prior verbal disclosures, gave Defendant documented notice of Plaintiff's ADHD before the February and March 2024 performance criticism and before the March 26, 2024 PIP.

**A SIGNIFICANTLY YOUNGER COWORKER THREATENED PLAINTIFF, BUT ANDRULEWICH REFUSED TO ADDRESS IT**

51. In or around March 2023, Plaintiff made her first in-person to Defendant's Trevose office.

52. During the visit, Plaintiff complimented Cagney.

53. Later that day, Cagney told Plaintiff, "My husband said I should throat punch you", or words to that effect, in front of Andrulewich and approximately fifteen (15) other coworkers.

54. However, Andrulewich took no action to address Cagney's conduct and she was not issued any discipline.

**CAGNEY DID NOT INFORM PLAINTIFF OF AN INITIAL CLIENT CALL UNTIL BEFORE AND THEN MUTED HER DURING THE CALL**

55. On or about April 6, 2023, Cagney scheduled an initial client call on a project without Plaintiff, the Project Manager.

56. Cagney only notified Plaintiff about the call minutes before the call.

57. However, when Plaintiff joined the call, Cagney muted Plaintiff.

58. The meeting ended before Plaintiff could respond to the team's questions.

**CAGNEY MOCKED PLAINTIFF, EXCLUDED HER FROM COMMUNICATIONS AND WITHHELD CRITICAL INFORMATION FROM HER**

59. Throughout 2023, Cagney mocked Plaintiff in front of others, excluded Plaintiff from emails, contradicted Plaintiff in meetings, refused to follow Plaintiff's instructions, withheld project information and responded to Plaintiff in Teams chats using all capital letters.

60. Additionally, Cagney ignored Plaintiff in meetings and talked over Plaintiff and the client.

61. Andrulewich witnessed Cagney's conduct, he took no action to address it.

62. Upon information and belief, Defendant had previously placed Cagney on a Performance Improvement Plan ("PIP") for similar conduct, including angry outbursts.

63. Plaintiff was substantially older than Cagney, and Defendant knew that Plaintiff had ADHD.

64. Despite management's knowledge of Cagney's repeated misconduct and, upon information and belief, her prior placement on a PIP for similar conduct, Defendant did not take comparable corrective action against Cagney.

**PLAINTIFF COMPLAINED TO HUMAN RESOURCES REGARDING CAGNEY'S DISCRIMINATORY CONDUCT**

65. In or around June 2023, Plaintiff reported Cagney's discriminatory conduct to Nathalie Richard, Senior Manager, HR Integrations, and provided copies of Cagney's Teams chats and text messages.

66. Although Richard acknowledged Plaintiff's prior complaints and possessed communications documenting those complaints, Richard did not formally document the complaints in Plaintiff's personnel file or conduct an independent HR investigation.

67. Instead, Richard directed Plaintiff back to Andrulewich and Urwin and stated that Andrulewich would address Cagney's conduct.

68. When Plaintiff questioned the lack of documentation, Richard maintained that the prior communications did not all belong in Plaintiff's personnel file.

69. Plaintiff had specifically asked that her complaints be documented.

70. Cagney's discriminatory conduct continued.

**ANDRULEWICH ASSIGNED PLAINTIFF TO A DIFFICULT CLIENT FOLLOWING HER COMPLAINT TO RICHARD**

71. Following Plaintiff's June 2023 complaint regarding Cagney, Andrulewich substantially reduced the regular mentoring and training he had previously provided Plaintiff and assigned Plaintiff to the Temple account, a notoriously difficult client.

**PLAINTIFF COMPLAINED TO RICHARD AGAIN ABOUT CAGNEY'S CONDUCT**

72. On or about September 27, 2023, Plaintiff complained again to Richard about Cagney's conduct.

73. Richard responded that Plaintiff would have to wait until on or about October 2, 2023, to go over her second complaint.

**THE DAY AFTER PLAINTIFF'S SECOND COMPLAINT, ANDRULEWICH REMOVED PLAINTIFF FROM THE NEXT PHASE OF A PROJECT AND REPLACED HER WITH CAGNEY**

74. The following day, on or about September 28, 2023, Andrulewich removed Plaintiff from the next phase of the J&J M2 project and replaced her with Cagney as the Project Manager.

75. Andrulewich claimed the reason for Plaintiff being replaced was that Holly Goodroad, Director of Engineering Professional Services for Genesis, an outside firm on the project, were upset that Plaintiff had changed a deliverable date.

76. Plaintiff disputes that explanation. Plaintiff had maintained the agreed deliverable date and was working to submit the deliverable on time; she did not understand Genesis to have raised any concern with her about that deadline.

77. At the time of the reassignment, Plaintiff was the M2 Project Manager. Cagney was a Senior Interior Designer who had only recently begun receiving Assistant Project Manager responsibilities and was being trained by Andrulewich for increased Project Manager responsibilities.

78. Importantly, Genesis had not raised any concerns with Plaintiff.

79. In addition, Cagney had significantly less project management experience than Plaintiff.

80. When Plaintiff informed Gaurav Guru, Lead Designer, of her removal from the project in a contemporaneous text-message exchange on September 28, 2023, Guru responded that the Genesis explanation "came as a surprise," questioned why Genesis had never raised any concern, and stated, "I am sure there is another reason behind this," or words to that effect. Guru also told Plaintiff, "as a PM, you were perfect."

81. The treatment of Cagney contrasted with Defendant's treatment of Plaintiff. Cagney, a substantially younger employee who, upon information and belief, previously had been placed on a PIP for similar behavioral issues, remained employed and received the next-phase project opportunity.

82. Plaintiff, whose ADHD was known to Defendant, was removed from that project, subsequently experienced reduced project authority and diminished mentoring and support, and later was placed on a PIP before ultimately being terminated.

83. Plaintiff contends that these materially different consequences support an inference of age and disability discrimination.

**ANDRULEWICH INSTRUCTED PLAINTIFF TO SUBMIT A DELIVERABLE THE FOLLOWING BUSINESS DAY AND CAGNEY SCREAMED AT PLAINTIFF UPON HER AGREEMENT**

84. On or about September 29, 2023, Plaintiff worked to finish an M2 deliverable by the end of the day, the deadline Plaintiff had set with her client.

85. Plaintiff did not receive Genesis engineers' input for the deliverable until late on or about September 28, 2023.

86. Cagney pressured Plaintiff to submit the deliverable by noon.

87. At approximately 4:00 p.m., Andrulewich called Plaintiff and told her to submit the deliverable on October 2, 2023.

88. Plaintiff informed Andrulewich that she was almost done.

89. Unbeknownst to Plaintiff, Cagney was listening to the call on Andrulewich's end.

90. When Plaintiff agreed to follow Andrulewich's direction, Cagney began to scream at Plaintiff.

91. Plaintiff was forced to submit the deliverable late, even though Plaintiff could have met the deadline.

**PLAINTIFF COMPLAINED TO URWIN ABOUT CAGNEY'S CONDUCT**

92. On or about October 2, 2023, Plaintiff met with Urwin and complained about Cagney's conduct.

93. However, Urwin did not take action to address Plaintiff's complaint.

**RICHARD INFORMED PLAINTIFF THAT SHE WOULD NOT INVESTIGATE HER COMPLAINT AND INSTRUCTED HER TO SPEAK WITH ANDRULEWICH AND/OR URWIN IF SHE HAD ADDITIONAL ISSUES WITH CAGNEY**

94. On or about October 2, 2023, Richard responded via email to Plaintiff's request for a meeting stating "before I accept this, have you spoken to [Andrulewich]? I need for him to make things clear with both of you before I get more involved."

95. On October 3, 2023, Plaintiff reported to Richard via email the incident in which Cagney screamed at her, that Cagney was regularly inappropriate towards her and that Cagney had been rewarded while Plaintiff had been punished.

96. Plaintiff complained further that she was not receiving proper representation with Cagney and requested to know her options, so that the issue could be resolved.

97. However, Richard responded that Andrulewich had to handle the matter because "the Projects are his" and that assigning Cagney to replace Plaintiff for the second phase of the project was his decision to make.

98. Richard instructed Plaintiff to bring any future issues to Andrulewich or Urwin.

99. Richard refused to investigate Plaintiff's complaints and in doing so, did not follow Defendant's Discrimination, Harassment & Retaliation Prevention Policy which requires a fair and thorough investigation of complaints.

**PLAINTIFF MET WITH ANDRULEWICH AND URWIN FOR AN "ALIGNMENT" MEETING, DURING WHICH HER ROLE WAS REDUCED ON ANOTHER PROJECT, AFTER PLAINTIFF HAD BEEN REMOVED FROM THE M2 PROJECT**

100. The next day, on October 4, 2023, Plaintiff met with Andrulewich and Urwin for an "alignment" meeting.

101. Andrulewich informed Plaintiff that contacting Human Resources further would not be helpful as Richard agreed Plaintiff's complaints were not a matter for Human Resources to investigate.

102. Plaintiff complained that she was being retaliated against as Cagney was being rewarded while Plaintiff was being punished.

103. Andrulewich denied Plaintiff's reassignment was punishment and stated to view the new projects as "clean slates" to remove the "hostile work environment", or words to that effect.

104. Andrulewich then informed Plaintiff that her role on the J&J Biofire project was going to be reduced, stating "Assistant PM is a good way to put it", or words to that effect.

105. Andrulewich also stated that Temple was a "very rough client" and that Plaintiff needed "someone else in your corner", or words to that effect.

**ANDRULEWICH DID NOT PROVIDE PLAINTIFF ADEQUATE SUPPORT FOR THE TEMPLE ACCOUNT AND PROMOTED CAGNEY TO PROJECT MANAGER**

106. However, Andrulewich did not provide Plaintiff any meaningful support on the Temple account.

107. Following Plaintiff's complaints, Defendant promoted Cagney and Andrulewich began training her for increased Project Manager responsibilities.

108. During the same period, Andrulewich substantially reduced Plaintiff's training and support.

109. On at least one occasion, Andrulewich told Plaintiff he could not attend Plaintiff's training because he was training Cagney, and he increasingly failed to respond to Plaintiff's Teams messages and emails seeking project-related guidance and direction.

110. Plaintiff contends that this withdrawal of mentoring and support, while Cagney received increased training and development opportunities, constituted materially different treatment following Plaintiff's complaints and preceded Defendant's later criticism of Plaintiff's performance.

**ANDRULEWICH BERATED PLAINTIFF AND SET GOALS THAT WERE NOT REQUIRED OF OTHER PROJECT MANAGERS**

111. On or about February 19, 2024, Andrulewich summoned Plaintiff for a "PM Skills" meeting in which he berated Plaintiff and set goals for her that were not required of other Project Managers.

**ANDRULEWICH BLAMED PLAINTIFF FOR BUDGET OVERRUNS ON THE BIOFIRE PROJECT**

112. In or around February 2024, Andrulewich blamed Plaintiff for budget overruns on the Biofire project.

113. The overruns resulted from hours charged by other employees and approved by Urwin.

114. Plaintiff did not have any authority over those employees' time entries.

**PLAINTIFF NOTIFIED ANDRULEWICH THAT HER SISTER WAS CRITICALLY ILL**

115. On or about March 13, 2024, Plaintiff informed Andrulewich that her sister was gravely ill and that she may need time off.

116. On March 15, 2024, Andrulewich asked Plaintiff to come to the Lehigh Valley office on March 18 for what he described as a mid-year review. Plaintiff's sister died on March 16.

117. Because Plaintiff was grieving and needed to address work requiring her immediate attention, Plaintiff requested that the meeting occur the following week after bereavement; the meeting was then scheduled for March 26, 2024.

**ANDRULEWICH CALLED PLAINTIFF AND CRITICIZED HER PERFORMANCE AFTER HER SISTER PASSED AWAY**

118. On March 16, 2024, Plaintiff's sister passed away.

119. Due to Andrulewich's scheduling demands, Plaintiff only took two (2) of her three (3) bereavement days before the meeting.

120. Days after Plaintiff's sister passed away, Plaintiff asked Andrulewich to reschedule a monthly financial review.

121. However, Andrulewich called Plaintiff and proceeded to criticize her performance.

**ANDRULEWICH AND URWIN PLACED PLAINTIFF ON AN UNWARRANTED PERFORMANCE IMPROVEMENT PLAN ("PIP")**

122. On March 26, 2024, Andrulewich and Urwin met with Plaintiff at the Lehigh Valley office for what had been represented to Plaintiff as her mid-year review.

123. At the meeting, Andrulewich and Urwin placed Plaintiff on an unwarranted Performance Improvement Plan ("PIP").

124. Plaintiff was not informed before the meeting that Defendant intended to present a PIP. The Teams meeting was identified as a "mid-year review," and Plaintiff contemporaneously objected in writing on March 27 that she had been unaware it was a PIP meeting until the meeting was underway.

125. The PIP criticized Plaintiff for things associated with her disability, including, but not limited to, difficulty focusing, tending to rush things, making minor mistakes and having run-on conversations.

126. Andrulewich relied upon the Temple account, the M2 project events prior to Plaintiff's removal and negative feedback Andrulewich solicited from Plaintiff's coworkers during her vacation from March 4, 2024 through March 8, 2024.

127. As a result of the PIP, Plaintiff's contracts, budget updates and billing reviews were required to be approved by Andrulewich or another Project Manager.

128. Importantly, Defendant did not offer Plaintiff any accommodation for Plaintiff's disability before or after the PIP.

**PLAINTIFF COMPLAINED TO ANDRULEWICH AND URWIN ABOUT THE PIP**

129. On March 27, 2024, Plaintiff emailed Andrulewich and Urwin that she did not agree with the PIP and would not sign it.

130. Plaintiff complained further that the PIP was issued in retaliation for her complaints to Human Resources and that Defendant's sporadic workflows and lack of clear standards were particularly difficult due to her disability.

131. Andrulewich responded to Plaintiff that, "The process is not optional."

132. Neither Andrulewich nor Urwin directed Plaintiff to contact Human Resources in order to obtain reasonable accommodations.

133. Plaintiff had disclosed ADHD-related work difficulties to Defendant, but Defendant did not initiate an accommodation dialogue concerning whether reasonable accommodation could address the disability-related difficulties she had identified before or during the PIP process.

**PLAINTIFF COMPLAINED TO RICHARD ABOUT THE PIP BEING IN RETALIATION FOR HER COMPLAINTS, BUT HER COMPLAINT WAS NOT ADDRESSED**

134. On April 2, 2024, Plaintiff complained to Richard via Microsoft Teams that she believed the PIP was retaliatory.

135. However, Richard denied Plaintiff's complaint and refused to conduct an investigation.

**PLAINTIFF REQUESTED A TRANSFER, BUT DID NOT RECEIVE A RESPONSE**

136. In or around April 2024, Plaintiff made a request to Sean O'Rourke, Discipline Leader, to be transferred out of Andrulewich's group.

137. Plaintiff sent O'Rourke her resume and portfolio upon his request.

138. O'Rourke informed Plaintiff that he would look into transferring her and would let her know.

139. However, O'Rourke did not respond to Plaintiff after this.

**PLAINTIFF WAS PLACED ON A MEDICAL LEAVE OF ABSENCE IN THE FORM OF FAMILY AND MEDICAL LEAVE ACT ("FMLA") LEAVE**

140. The passing of Plaintiff's sister followed by the issuance of the PIP caused Plaintiff severe anxiety and depression.

141. On April 2, 2024, Plaintiff called out of work due to her disabilities.

142. On April 3, 2024, Plaintiff submitted a note from Dr. Matthew J. Winas, Primary Care Physician, who placed Plaintiff on a medical leave of absence beginning on April 2, 2024.

143. On or about April 26, 2024, Plaintiff submitted her application for Family and Medical Leave Act ("FMLA") leave with the physician certification completed by Dr. Winas.

144. Defendant approved Plaintiff's request for FMLA leave.

**PLAINTIFF REMAINED ON A MEDICAL LEAVE OF ABSENCE THROUGH A REASONABLE ACCOMMODATION**

145. On June 26, 2024, Plaintiff exhausted her FMLA leave.

146. However, Plaintiff was not medically cleared to return back to work, as Dr. Winas had not cleared her to return to work pending examination on September 3, 2024.

147. On July 9, 2024, Barbara Rowley, Leave of Absence Specialist, Human Resources, informed Plaintiff that her medical leave of absence was now considered to be a reasonable accommodation until her expected return to work date of September 6, 2024.

**DR. WINAS EXTENDED PLAINTIFF'S MEDICAL LEAVE OF ABSENCE AND DEFENDANT APPROVED THE EXTENSION REQUEST**

148. However, on August 21, 2024, Dr. Winas examined Plaintiff and extended her medical leave of absence from August 22, 2024 through September 30, 2024.

149. That same day, Plaintiff emailed Dr. Winas's note to Rowley.

150. Plaintiff repeatedly followed up with Rowley regarding her medical leave extension after not receiving a response.

151. On September 5, 2024, Rowley informed Plaintiff that Defendant had approved her request for an extension to her medical leave through September 30, 2024.

152. The August 21, 2024 physician documentation provided to Defendant excused Plaintiff from work through September 30, 2024 and stated that she "May return on: 10/1/24."

153. Defendant therefore knew before the termination decision that Plaintiff's medical documentation identified October 1, 2024 as her anticipated return date.

**DR. WINAS CLEARED PLAINTIFF TO RETURN TO WORK WITH REASONABLE ACCOMMODATIONS**

154. On September 27, 2024, Dr. Winas examined Plaintiff and cleared her to return to work on October 1, 2024.

155. Dr. Winas also wrote Plaintiff a note requesting reasonable accommodations for three (3) months of continued remote work with periodic breaks, clear written instructions for tasks and expectations, permission to record meetings, detailed task lists and organizational tools, regular meetings with a supervisor to help manage workload,

extended deadlines when possible or larger projects broken into smaller tasks, time for medical and therapy appointments, job coaching for ADHD-related challenges and retraining upon her return from her medical leave of absence.

**DEFENDANT TERMINATED PLAINTIFF**

156. On September 26, 2024, Richard called Plaintiff and informed her that her employment would be terminated.

157. During the September 26, 2024 termination call, Plaintiff again requested a transfer to another position.

158. Richard denied the request and told Plaintiff that she could not transfer because she was on a PIP.

159. Shortly afterwards on September 27, 2024, Richard sent Plaintiff a termination letter dated September 27, 2024, and effective October 1, 2024, the day Plaintiff was scheduled to return to work from her medical leave of absence.

160. No reason was provided for Plaintiff's termination in the letter.

161. At the time of her anticipated October 1, 2024 return, Plaintiff was able to perform the essential functions of her position with reasonable accommodation.

162. Defendant did not complete an individualized return-to-work accommodation discussion with Plaintiff before communicating the termination decision.

163. Despite Plaintiff's September 26, 2024 request for transfer rather than termination, Defendant did not engage Plaintiff in an individualized discussion concerning reassignment to an available vacant position for which she was qualified.

164. Defendant operated numerous offices nationwide, and Plaintiff had performed her position remotely and had worked across groups and offices, including work capable of being performed remotely.

165. Plaintiff was 59 years old at the time of her termination.

166. Plaintiff was 59 years old when Defendant selected her for termination. During the period preceding the termination, Defendant treated Cagney, a substantially younger employee, more favorably by giving her the next-phase J&J M2 project opportunity from which Plaintiff had been removed and thereafter providing Cagney increased Project Manager training and responsibility.

167. Upon information and belief, Defendant recruited and/or hired Brenda Sanchez in or about January 2024 for Project Manager or project-management-type work. Sanchez had Project Manager experience.

168. Her hiring occurred shortly before Defendant's February/March 2024 escalation of scrutiny of Plaintiff's work and approximately eight months before Defendant terminated Plaintiff.

169. The precise position for which Sanchez was recruited, her initial title and job code, project assignments, utilization, age or age band, and related hiring records are within Defendant's possession and control.

170. Upon information and belief, Defendant also retained substantially younger employees performing architecture or related project work when it terminated Plaintiff; the detailed ages, qualifications, assignments, utilization, and termination-selection criteria of which are within Defendant's possession and control.

171. Defendant discriminated against Plaintiff due to her age and disabilities and retaliated against her for complaining about the aforementioned discrimination and for requesting a reasonable accommodation in violation of the ADEA, the ADA, and the PFPO.

172. In addition, Defendant retaliated against Plaintiff for utilizing her right under the FMLA in violation of the FMLA.

173. Defendant's acts and/or omissions were willful or performed with reckless disregard to Plaintiff's federal statutorily protected rights.

**COUNT I – AGE DISCRIMINATION**
**AGE DISCRIMINATION IN EMPLOYMENT ACT**

174. Plaintiff incorporates the preceding paragraphs as if set forth more fully at length herein.

175. Plaintiff was born in 1965.

176. Plaintiff was qualified to perform the job.

177. Defendant terminated Plaintiff.

178. Defendant treated younger employees more favorably than Plaintiff.

179. The more favorable treatment included assigning the next-phase J&J M2 project opportunity to Cagney, a substantially younger employee, after removing Plaintiff from that project and thereafter providing Cagney increased Project Manager training and responsibility. Upon information and belief, Defendant also retained other substantially younger employees performing architecture or related project work when Plaintiff was selected for termination.

180. Defendant has no legitimate non-discriminatory reason for its actions.

181. As a result of Defendant's unlawful age discrimination, Plaintiff has suffered damages as set forth herein.

**WHEREFORE**, Plaintiff seeks the damages set forth in the Prayer for Relief clause of

this Complaint, *infra*.

**COUNT II – AGE DISCRIMINATION**
**PHILADELPHIA FAIR PRACTICES ORDINANCE**

182. Plaintiff incorporates the preceding paragraphs as if set forth more fully at length herein.

183. The foregoing conduct by Defendant constitutes unlawful discrimination against Plaintiff on the basis of her age.

184. As a result of Defendant's unlawful discrimination, Plaintiff has suffered damages as set forth herein.

**WHEREFORE**, Plaintiff seeks the damages set forth in the Prayer for Relief clause of this Complaint, *infra*.

**COUNT III – DISABILITY DISCRIMINATION**
**AMERICANS WITH DISABILITIES ACT OF 1990, AS AMENDED**

185. Plaintiff incorporates the preceding paragraphs as if set forth more fully at length herein.

186. Plaintiff is a "qualified individual with a disability" as that term is defined under the ADA because Plaintiff has, or had at all times relevant hereto, disabilities that substantially limits or limited one or more major life activities or because Plaintiff had a record of such an impairment or because Plaintiff was regarded as and/or perceived by Defendant and its agents as being disabled.

187. Plaintiff was qualified to perform the job.

188. Plaintiff was subject to an adverse employment action, including, but not limited to termination.

189. Circumstances indicated that Plaintiff's disabilities were the reason for the adverse employment action.

190. Defendant did not have a legitimate non-discriminatory reason for Plaintiff's adverse

employment actions.

191. Plaintiff's disabilities motivated Defendant's decision to take adverse actions against Plaintiff.

192. The purported reason for Defendant's decision is pretextual.

193. Others similarly situated but outside of Plaintiff's protected class were treated more favorably.

194. The above actions by Defendant also constitute a failure to accommodate and a failure to engage in the required interactive process.

195. As a result of Defendant's unlawful disability discrimination, Plaintiff has suffered damages as set forth herein.

196. Defendant's conduct was willful or with reckless disregard to Plaintiff's federally protected statutory rights.

**WHEREFORE**, Plaintiff seeks the damages set forth in the Prayer for Relief clause of this Complaint, *infra*.

**COUNT IV – DISABILITY DISCRIMINATION**
**PHILADELPHIA FAIR PRACTICES ORDINANCE**

197. Plaintiff incorporates the preceding paragraphs as if set forth more fully at length herein.

198. Plaintiff is a "qualified individual with a disability" as that term is defined under the PFPO because Plaintiff has, or had at all times relevant hereto, disabilities that substantially limits or limited one or more major life activities or because Plaintiff had a record of such an impairment or because Plaintiff was regarded as and/or perceived by Defendant and its agents as being disabled.

199. Plaintiff was qualified to perform the job.

200. Plaintiff was subject to an adverse employment action, including, but not limited to

termination.

201. Circumstances indicated that Plaintiff's disabilities were the reason for the adverse employment action.

202. Defendant did not have a legitimate non-discriminatory reason for Plaintiff's adverse employment actions.

203. Plaintiff's disabilities motivated Defendant's decision to terminate Plaintiff.

204. The purported reason for Defendant's decision is pretextual.

205. Others similarly situated but outside of Plaintiff's protected class were treated more favorably.

206. The above actions by Defendant also constitute a failure to accommodate and a failure to engage in the required interactive process.

207. As a result of Defendant's unlawful disability discrimination, Plaintiff has suffered damages as set forth herein.

**WHEREFORE**, Plaintiff seeks the damages set forth in the Prayer for Relief clause of this Complaint, *infra*.

**COUNT V – RETALIATION**
**AGE DISCRIMINATION IN EMPLOYMENT ACT**

208. Plaintiff incorporates by reference each allegation contained in the preceding paragraphs as if the same were set forth more fully at length herein.

209. Plaintiff engaged in activity protected by the ADEA.

210. Thereafter, Defendant took adverse employment actions against Plaintiff, including, but not limited to, termination.

211. There exists a causal connection between Plaintiff's participation in the protected activity and the adverse employment action.

212. Defendant's conduct/omission was willful or done with reckless disregard to Plaintiff's federally protected statutory rights.

**WHEREFORE**, Plaintiff seeks the damages set forth in the Prayer for Relief clause of this Complaint, *infra.*

## COUNT VI – RETALIATION
## AMERICANS WITH DISABILITIES ACT OF 1990, AS AMENDED

213. Plaintiff incorporates by reference each allegation contained in the preceding paragraphs as if the same were set forth more fully at length herein.

214. Plaintiff engaged in activity protected by the ADA.

215. Thereafter, Defendant took adverse employment actions against Plaintiff, including, but not limited to, termination.

216. There exists a causal connection between Plaintiff's participation in the protected activity and the adverse employment action.

217. Defendant's conduct/omission was willful or done with reckless disregard to Plaintiff's federally protected statutory rights.

**WHEREFORE**, Plaintiff seeks the damages set forth in the Prayer for Relief clause of this Complaint, *infra.*

## COUNT VII – RETALIATION
## PHILADELPHIA FAIR PRACTICES ORDINANCE

218. Plaintiff incorporates by reference each allegation contained in the preceding paragraphs as if the same were set forth more fully at length herein.

219. Plaintiff engaged in activity protected by the PFPO.

220. Thereafter, Defendant took adverse employment actions against Plaintiff, including, but not limited to, termination.

221. There exists a causal connection between Plaintiff's participation in the protected activity and the adverse employment action.

**WHEREFORE**, Plaintiff seeks the damages set forth in the Prayer for Relief clause of this Complaint, *infra.*

**COUNT VIII – RETALIATION**
**FAMILY AND MEDICAL LEAVE ACT OF 1993, AS AMENDED**

222. Plaintiff incorporates all the above paragraphs as if they were set forth at length herein.

223. Pursuant to 29 U.S.C. § 2611(2)(A) and 29 U.S.C. § 2612(a)(1)(D), Plaintiff was eligible for leave under the FMLA.

224. At all times material, Defendant knew, or should have known, of Plaintiff's need for FMLA Leave to care for her own serious medical conditions.

225. Plaintiff gave Defendant sufficient information to allow it to understand that she needed leave for FMLA-qualifying reasons.

226. The retaliation occurred in the form of the continued implementation of a policy that discourages and interferes with Plaintiff's right to invoke her federally protected rights under the FMLA.

227. As a result of Plaintiff's attempt to invoke her FMLA rights, by requesting and utilizing her FMLA rights, Defendant has retaliated against Plaintiff by terminating her employment.

228. Defendant's motivation for retaliating against Plaintiff was connected causally to Plaintiff's FMLA leave.

229. Upon information and belief, in selecting Plaintiff for termination, Defendant considered Plaintiff's protected FMLA absence and/or employment measures materially affected by that absence, including availability, utilization, project assignment, staffing, or similar

criteria. The relevant selection criteria, leave coding, utilization/staffing information, project assignments, and decisionmaker communications are principally within Defendant's possession and control.

230. Defendant has acted in bad faith by retaliating against Plaintiff in violation of the FMLA.

231. As a direct and proximate result of Defendant's discharge of Plaintiff, Plaintiff is and was deprived of economic and non-economic benefits resulting from Defendant's willful and/or non-willful actions including but not limited to: loss of back pay, loss of increase in salary, loss of benefits preceding Plaintiff's filing of the lawsuit, cost of providing care, and double liquidated damages under the FMLA for violations not made in good faith.

232. Plaintiff demands judgment against Defendant for all available equitable relief including, but not limited to: reinstatement to job position, full restoration of all leave and health benefits, to which Plaintiff was entitled, and any additional unpaid leave up to the maximum permitted by the FMLA including but not limited to doubling the damages proven inclusive of all wages, salary, employment benefits or other compensation denied or lost.

233. Plaintiff further demands favorable judgment against Defendant for all interest on the monetary benefits calculated at the prevailing rate, an additional amount equal to those sums, as liquidated damages under §107(a), fees and costs including the allowance of reasonable attorneys' fees, expert witness fees and other costs of the action against Defendant and such other orders and further relief as may be necessary and appropriate to effectuate the objectives of the FMLA.

**WHEREFORE**, Plaintiff demands compensatory and liquidated damages in addition to counsel fees and costs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, Jacqueline Nuber, requests that the Court grant her the following relief against Defendant:

(a) Damages for past and future wage loss, including lost employment and retirement benefits;

(b) Compensatory damages for other economic and non-economic harm including, *inter alia*, mental anguish and/or emotional distress;

(c) Liquidated damages;

(d) Punitive damages;

(e) Reasonable attorneys' fees;

(f) Recoverable costs;

(g) Pre and post judgment interest;

(h) An allowance to compensate for negative tax consequences of a lump sum award in a single tax year;

(i) Order Defendant to remove and expunge, or to cause to be removed and expunged, all negative, discriminatory, and/or defamatory memoranda and documentation from Plaintiff's record of employment, including, but not limited, the pre-textual reasons cited for its adverse actions, disciplines, and termination; and

(j) Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, including reinstatement or front pay in lieu of reinstatement to the extent permitted by law, pursuant to Rules 64 and 65 of the Federal Rules of Civil Procedure.

## JURY TRIAL DEMAND

Demand is hereby made for a trial by jury as to all issues.

**CERTIFICATION**

I hereby certify that to the best of my knowledge and belief the above matter in controversy is not the subject of any other action pending in any court or of a pending arbitration proceeding, nor at the present time is any other action or arbitration proceeding contemplated.

**RESPECTFULLY SUBMITTED,**

**KOLLER LAW, LLC**

Date: September 25, 2026

**By:** ***/s/David M. Koller***

David M. Koller, Esquire
Jordan D. Santo, Esquire
2043 Locust Street, Suite 1B
Philadelphia, PA 19103
215-545-8917
davidk@kollerlawfirm.com
jordans@kollerlawfirm.com

*Counsel for Plaintiff*